## ALLEN v. CARLQUIST et al.

No. 6678.   Decided July 20, 1944.   (150 P. 2d 768.)

Rehearing denied September 1, 1944.

See 5 C. J. S. Appeal and Error, Sec. 1786. 3 Am. Jur., 655.

IRVINE, SKEEN & THURMAN, of Salt Lake City, for appellant.

GAYLEN S. YOUNG, of Salt Lake City, for respondent and interpleaded defendant.

WOLFE, Chief Justice.

This action was originally brought in the City Court of Salt Lake City in March, 1934, upon a judgment previously entered in the same court in March, 1926. The defendant defaulted and judgment was entered against him in February, 1936. No notice of the entry of this latter judgment was ever served on the defendant. When in 1943 the plaintiff attempted to enforce his said judgment, the defendant prosecuted an appeal from it to the District Court for Salt Lake County.

In the District Court the defendant appeared and filed his answer. He subsequently filed an amended answer in which he alleged that the whole of the 1926 judgment had been satisfied by payment on August 2, 1926. By way of counterclaim the defendant further alleged that payments had been made on the said judgment since 1926, but that said payments were made under a mistake of fact. He alleged that part of the payments had been made to one John A. Burt and prayed that Burt be interpleaded as a party defendant and that judgment be entered on the counterclaim against Burt and the plaintiff for the amounts so paid.

The plaintiff by reply admitted the payment of certain specified sums and denied the remaining allegations of the defendant's counterclaim. Burt entered an appearance, admitted that he had purchased the judgment from plaintiff Allen, admitted that various sums were paid to him on said judgment, but denied that the judgment had been paid in full or that any payments had been made under a mistake of fact.

The District Court found against the defendant and entered judgment in favor of the plaintiff. It also found that John A. Burt had succeeded to the plaintiff's interest and that Burt was proceeding in the name of the plaintiff. From this judgment the defendant prosecuted this appeal.

Since the defendant in his answer admitted the existence of the 1926 judgment against him, the only disputed issue was raised by the affirmative defense of payment. The claim that the judgment had been paid was based on a series

of transactions which had their origin at a time prior to the 1926 judgment and involved the promissory note upon which the 1926 judgment was based.

Our task has been increased in difficulty by reason of the evidence being insufficient to reveal the fact situation to a point where its legal effect could convincingly be pronounced. Furthermore, both the defense and affirmative defense were founded on payment. But the brief of appellant and his oral argument were based on the theory that he was a surety and that an arrangement between Allen and Goff for settlement of Goff's dissatisfaction, without Carlquist's knowledge, worked a discharge of Carlquist as surety of Goff. Of course, a plea of payment on the theory that Carlquist was the primary and only debtor of Allen on Allen's note against him is an entirely different defense than that of a contention that Carlquist was a surety for Goff and only secondarily liable to Allen and that as such surety he was discharged from his note to Allen. We could well have dismissed this case because of such complete shifting of theories. But having spent considerable time in analyzing the possibilities of a defense we give counsel the benefit of such analysis. We have considered various interpretations and inferences of which the evidence may be susceptible in order to determine whether defendant's theory may be feasible under any of them. We have chosen for detailed recitation hereunder the situation which we think can by the fairest intendment from the evidence be inferred.

The facts as disclosed by the record appear to be as follows: In 1924, James P. Erskine and the plaintiff, A. G. Allen, were selling a tract of farm land to one Doyle and his wife. The Doyles for three years had neglected to pay the taxes and there were approximately $500 in delinquent taxes assessed against this property. Erskine, who resided in California, visited Salt Lake City and insisted that something be done about the matter. Goff testified that Doyle had deserted his wife and that she enlisted the services of the defendant, Carlquist, to aid her in salvaging the Doyle

equity in the property. At that time Carlquist told Erskine that he would do his best to make a deal where the taxes could be paid up and someone step into the shoes of the Doyles. Through the efforts of Carlquist, one A. J. Goff was interested in the land and subsequently agreed to purchase it. Goff agreed to pay a total of $10,000 for the land. This $10,000 was to be paid by the execution of a purchase contract with Allen and Erskine under the terms of which Goff was to pay Allen and Erskine $7,000. The remaining $3,000 was to be paid in part by an exchange of other property valued at $2,500. This amount was apparently credited against the amount owed to Mrs. Doyle to acquire her equity. The balance was paid by the execution of a $500 note to one Christiansen, which note was apparently later acquired by Carlquist. No cash was paid in the closing of this deal and neither Mrs. Doyle nor Goff could pay the money necessary to pay up the back taxes. Carlquist then told Erskine that he would see that the taxes were paid and Erskine okeyed the deal. It appears that Carlquist intended to use the $500 which Goff was to pay on the note to Christiansen to reimburse him for his payment of these taxes, but there is no evidence that Goff gave the note in recognition of an obligation by him to pay the taxes.

Goff subsequently discovered that the land was infested with "White Top." He told Allen that he would not pay the agreed price and threatened to sue for misrepresentation. He and Allen entered into further negotiations and Goff agreed to pay $4,400 in full settlement of his obligations on the land. Goff testified that he "understood" that this settlement was to cancel all of his obligation to Carlquist on the $500 note as well as all liability on the $7,000 contract of purchase. But as will be subsequently noted, the evidence does not establish that Allen so agreed. In order to raise the $4,400 it was necessary for Goff to borrow on the land. It was necessary in order to consummate this loan that the back taxes be paid. Allen called upon Carlquist for payment of the taxes. Carlquist rather than advance the money for the taxes signed a promissory note payable to Allen for $535

and Allen advanced the money for the payment of the taxes. It is this note from Carlquist to Allen which formed the basis of the original suit which resulted in the 1926 judgment in favor of Allen and against Carlquist.

On August 2, 1926, after the Carlquist-to-Allen note had been reduced to judgment, Goff settled with Allen in full by paying the compromise price of $4,400. Carlquist on this appeal urges that this payment by Goff to Allen had the legal effect of satisfying the judgment which Allen had against Carlquist. In support of this contention Carlquist urges: (1) That Goff was primarily liable to Allen for the $500 to pay the delinquent taxes; (2) that Carlquist's liability for the payment of these taxes was secondary as surety to guarantee payment by Goff; and (3) that when Goff settled in full with Allen this discharged the primary obligation and released Carlquist from any obligation to pay the taxes. The evidence does not support this chain of reasoning.

In regard to the contention that Goff was primarily liable to Allen there is not one word of testimony. True Carlquist testified that he promised "to see that Goff paid the taxes" but this is not the same as testifying that Goff promised to pay them. Goff who was Carlquist's ■ witness testified that he agreed to pay a total purchase price of $10,000 for which he was to get a title free and clear of all encumbrances including these tax liens. It is true that the sellers, and we include as "sellers" the Doyles and Allen and Erskine, intended to use part of the purchase money from Goff to pay the taxes—but this intention could not create a legal obligation on the part of Goff to pay these taxes himself. In this regard Goff, on cross-examination, testified:

"Q. So, when that five hundred dollar note was given, you did not agree to pay those back taxes? A. Any more than what that letter said, that I would be liable for that much for taxes; I was going on those papers.

"Q. Did you think you would be liable for the note or the taxes? A. For the note.

"Q. After giving that note you did not intend to come up to the County Building and pay the taxes, did you? A. No, sir.

"Q. You gave that note as a part of the consideration of the seven thousand five hundred dollars or the ten thousand dollars; is that correct? A. Yes sir.

"Q. Let us put it this way: You gave ten thousand dollars, twenty-five hundred representing your home, the five hundred dollar note, and the seven thousand dollar contract which was to represent full payment at that time? A. Yes sir.

"Q. That five hundred dollars that was given in a note really did not make any difference with you what they did with it, did it? A. No sir.

"Q. Just so the property came to you free and clear of encumbrance: but your agreement in the beginning was to pay ten thousand dollars for the property, free and clear of all encumbrance up to that date? A. Yes sir."

Since Goff was Carlquist's witness, Carlquist cannot complain because the trial court elected to belief Goff when he testified that he never agreed to pay the taxes. In view of this evidence and the fact that there is no evidence that Goff ever agreed to do any thing except pay the total purchase price, we cannot hold that the trial court erred in this regard. When Allen and Goff reopened negotations concerning the amount that Goff would pay, they could not in any way change Goff's legal liability on the $500 note which Goff had executed. Carlquist was not a party to those negotiations and never agreed to take less than the full $500 in settlement of this note.

Likewise there is no evidence to support the contention that Carlquist's obligation to Allen was only secondary. There is no evidence that anyone except Carlquist assured Allen and Erskine that the taxes would be paid. Carlquist's assurance that he would see that the taxes were paid by Goff did not have the legal effect of obligating Goff to pay the taxes. Erskine and Allen's concern over these unpaid taxes and Carlquist's promise to them that the taxes would be paid indicates clearly that the taxes were never to have been paid by the portion of the purchase money going to Allen and Erskine. It was the Doyles who let the taxes

get delinquent. In all probability the money which was to have been used to pay the taxes was money which otherwise would have gone to the Doyles. This would explain why $500 of the purchase money was to be paid to Carlquist who was acting as agent for the Doyles.

If, in the final settlement with Allen, Goff did pay Allen all that was claimed in settlement of the $7,000 due under the contract of purchase plus an additional $500 to discharge Goff's liability to Carlquist, then Allen was given $500 of Carlquist's money. Carlquist could have insisted that it be applied to satisfy the judgment which Allen held against him. But if such was Carlquist's theory it should have been set forth in the pleadings. At all events it does not disclose a suretyship. Further, the only evidence adduced on this point was the testimony of Goff. He testified that he paid Allen in full and that he had the "understanding" that this also discharged his liability to Carlquist on the $500 note. It would be highly unreasonable for Goff to attempt to pay off his obligation to Carlquist by giving the money to Allen. Further probing as to the source of Goff's "understanding" was not very enlightening. There is no evidence that Allen ever understood that $500 of the $4,400 paid by Goff was to be given to Carlquist. Since Goff was not himself liable to Allen for the taxes, the fact that he paid Allen in full would not relieve Goff of his obligation to Carlquist nor would it relieve Carlquist of his obligation to Allen. They were separate and distinct transactions between different parties and made at different times. The payment of one was not a discharge of the other.

Complaint is made that the so-called "findings of fact" entered by the trial court are in fact "conclusions of law." We need not, however, determine this point for even if such were the case it would not be prejudicial. The only findings which the court could have made on the evidence adduced would have been findings against the defendant and in favor of the plaintiff. No good purpose could be served by a reversal so that the court could

enter more detailed findings—the same result would be reached in any event.

Judgment affirmed. Costs to respondents.

McDONOUGH and WADE, JJ., and WILL L. HOYT, District Judge, concur.

LARSON, Justice (dissenting).

I dissent.

There are some questions which arise in this case which are not answered or disposed of by the opinion. They can best be seen from a terse statement of the essential facts out of which they grow. Goff bought certain lands from Allen for $10,000; he paid $2,500 for Doyles' equity; he contracted to pay Allen $7,000; and he (Goff) was to pay the delinquent taxes in the sum of $500. Since Goff did not have the $500 to pay the taxes, Carlquist induced Allen to waive immediate payment of the taxes by assuring Allen that he, Carlquist, would see that Goff paid the taxes. Goff then executed his note to Carlquist for $500. The next year when dispute arose over the condition of the land with reference to white top, etc., Allen compromised the dispute by accepting from Goff the sum of $4,400 in full payment for the land, which therefore included all Goff's obligations under the contract; covering both the agreement to pay the delinquent taxes ($500) and the $7,000 additional to Allen. This creates a situation whereby: (1) Allen was to pay the delinquent taxes out of the $4,400; or (2) Goff waived the requirement that the title be free of the tax lien, and assumed to pay that himself; or (3) that both parties waived the matter of taxes on the assumption and ground that the payment of delinquent taxes had been assumed by and had become a new and separate obligation of Carlquist and that both Allen and Goff had accepted Carlquist as the only person liable to either for the payment of taxes, and therefore the matter of taxes would not be involved as between Allen and Goff. Allen then gave Carlquist $535 which he turned over to the

county to clear the land of the delinquent taxes, and Allen took a note from Carlquist for $535 which note subsequently became the basis of this action. At this time, Carlquist was not advised that Allen was making a new contract with Goff, relieving Goff from his obligation to pay the taxes. Carlquist thought that Allen had cancelled the Goff contract and was calling upon Carlquist to make good on his promise to see the taxes were paid. This payment of taxes by Allen shows that in the $4400 compromise settlement between Goff and Allen, Allen was to pay the delinquent taxes. Since this had been a direct obligation of Goff's it would seem to definitely establish proposition (1) as stated above.

Referring back now to the original deal between Goff and Allen, when Goff made his note to Carlquist for $500, we have three possible situations (a) Goff, who was to pay the taxes, borrowed the $500 from Carlquist, as evidenced by his note, the money to be applied by Carlquist in payment of the taxes; (b) Carlquist was not to advance any money, but, acting for Allen, was to negotiate the Goff note or collect the same from Goff, and use the money so derived to pay the taxes; or (c) Since Carlquist had given his word of assurance to Allen that he would see that the taxes were paid, he held Goff's note to protect himself should he be called upon by Allen to make good his promise to see the taxes were paid.

It is evident from the record that proposition (a) could not have been the understanding of the parties. If (b) represents the situation, then when Allen reduced the entire Goff obligation to $4,400, he cancelled the Goff note to Carlquist, since as between them, the real property in the note was in Allen. (c) If that note was to protect Carlquist by giving him evidence for a recourse against Goff if he, Carlquist, was required to make good on his assurance to Allen that Goff would pay the taxes, then Carlquist would be merely a surety or guarantor, and would be released from liability on his promise of assurance when Allen settled

with Goff for $4,400, and Goff's note to Carlquist would become null and void, and of no further effect in the hands of the parties.

When Allen and Goff agreed to settle the whole affair for $4,400, Goff was to make a loan so as to pay cash. To procure the loan the taxes had to be paid, so Allen talked to Carlquist about Carlquist's promise to see the taxes were paid. I epitomize the record as to all that appears as to the taxes. Carlquist testified that when the first deal was made with Goff, he told Erskine (with whom he did the business for the Erskine-Allen interests) that he would see the taxes were paid, and gave Erskine a letter to that effect. "I finally agreed that I would see that Mr. Goff paid them" (the taxes). Carlquist did not agree to pay them. (Trans. 11.) And the deal was closed by Goff assuming a contract unpaid balance of $7000, and giving a note for $500, "the proceeds of that note to liquidate the taxes." (Trans. 6.) Soon thereafter Erskine died and Allen took charge of the Erskine-Allen end of the deal. When Allen came up from California in 1925, he called on Carlquist to make good on his promise to Erskine. "May I say I had agreed to have Mr. Goff pay the taxes, and Mr. Goff had given me a note to make good his promise to me that he would pay those taxes." (Trans. 16.) "Mr. Allen said: 'Mr. Carlquist, I will take your note and you pay those taxes with the money I let you have, and then you can get your money from Mr. Goff later.' There was the obligation I had from Goff which would offset it." (Trans. 17.)

On this matter Goff testified that his original purchase price was $10,000 on which he deeded Duchesne property at $2,500( and signed a $7,000 contract and a $500 note; that he gave the note as a part of the consideration of the $7,500 balance on the land and that "I would be liable for that much for taxes." (Trans. 37.) That by the later contract with Allen for $4,400 he was to be relieved of all other obligations of every kind. (Trans. 42.)

Then with reference to the conversation with Allen where-

in the settlement at $4,400 was arranged, Goff testified (Trans. 26) :

"Q. What if anything was said in that conversation as to what was to be included in the settlement? A. That was to be all the obligations; that the place was to come to me clear, except for my obligation to the state.

"Q. Were you to be relieved of this obligation to Mr. Carlquist on the note? A. That was my understanding, that was all I owed. When I signed that [the $4400 state loan] over to them, I figured that was all I owed on the place * * * they [Allen-Erskine] agreed that is I would borrow what I could on that [the land] and pay the balance [$4400] that the place would be mine after I had paid back to the State." (Trans. 27.)

Then after testifying he had not paid the note to Carlquist, although several demands were made:

"I told them I did not owe it * * * because I had made a different deal and settled through Walter C. Hurd and Allen." (Trans. 28, 29.)

"Q. And the amount you agreed to pay for the two interests was $4400 on the final settlement? A. Yes sir.

"Q. And by that amount, by the payment of that amount you stated you were relieved of all other obligations of every kind? A. Yes sir.

"Q. You stated that you paid to Allen and Erskine's estate the entire $4400 that you agreed upon in settlement of all obligations up to that time? A. Yes sir." (Trans. 42.)

Carlquist testified that he was in California when Allen sued him on the $535 note; that at such time he understood Allen had cancelled out the Goff contract for default and so considered himself liable on the note to Allen; that he did not know until this present suit that Allen had accepted money from and relieved Goff from all liability growing out of the first purchase contract and thereby released Goff from liability on the original note, and had settled with Goff, the latter's liability for the taxes. When he learned that he commenced to fight.

I see no escape from the conclusion that by the original contract Goff assumed and was to pay the $500 back taxes; that he executed a note for $500, delivered to Carlquist, but

actually for the benefit of the Erskine-Allen interest, the proceeds thereof to be applied on the taxes; that Carlquist gave Erskine a letter of assurance that he would see that Goff paid the taxes; that when Erskine died and Allen entered the deal, he, Allen, released Goff from all liability including the tax liability evidenced by the $500 note, growing out of the original contract, upon payment of $4,400 cash; that by the new contract with Goff Allen agreed and assumed to pay the back taxes; that the $535 note from Carlquist to Allen was obtained by Allen by concealing from Carlquist the fact that Allen had made a new contract with Goff releasing Goff from the tax liability, and so from the $500 note, of which Erskine and Allen were the real parties in interest; that Carlquist received no consideration for the $535 note, and that judgment should have been for the defendant.

I think the pleadings were ample to raise all these questions and to require findings thereon.

I think the judgment should be reversed.

MOFFAT, Justice, deceased.